Call the next case. Mr. Riffle, you may proceed. Thank you, Your Honor. Good. Please record, Counsel. My name is Bob Riffle and I'm here today representing R&R Ardman and the Clark family that own that company. This is an extreme example of a franchisor failing to renew a franchise agreement under the Illinois Motor Vehicle Franchise Act. And what makes it really extreme is that the franchisor in this case takes the position that it can offer a renewal of the franchise agreement that essentially eviscerates all the value to my client without running afoul of the specific statutory prohibitions. This case involves, I think, a pure case of statutory construction. The court has called upon to interpret and construe Section 4D-6 in the Illinois Motor Vehicle Franchise Act. The specific issue in this case that we have raised is whether a franchisor can eliminate territorial protections and, in fact, other types of protections without noticing cost. A very brief factual background just to set the stage here. My client negotiated for and obtained exclusive statewide rights to market the Airstream Motor Home product. It enjoyed those rights. It spent money advertising and establishing its franchise and then just wanted to establish that. It was presented with what purported to be a renewal agreement, but it had no territorial protection. It was submitted as a debarment for and given in the prior agreement. What happened was Airstream submitted and then crammed down my client's throat an agreement that took away exclusive statewide territory. Well, as a matter of statutory construction, isn't the only thing the legislature said was that you can't substantially change or modify the sales and service obligations or capital requirements? Isn't that what the legislature said? We read that differently, respectfully. We view Section 4D-6 as saying there are three things you can't do. You can't cancel without noticing cost. You can't fail to renew without noticing cost. And you can't renew or replace by substantially changing or modifying sales or service obligations, notwithstanding any term contained in the contract. We reread that as three separate things you can't do. The way Airstream reads that is two things you can't do, and then you look at the third clause and say, but we can renew under any circumstances as long as we don't substantially change or modify sales and capital requirements. Well, I mean, then would it be fair to say your interpretation would be by saying renew, you say they've got to offer exactly the same contract? Well, I think they have to renew on substantially the same grounds under the second clause there. Then why have the third clause? Well, I would acknowledge this isn't a model of clarity. I think there is potentially an ambiguity. One possibility is that the third clause only applies in circumstances where there's an express prohibition in the contract or an express provision that allows a change in modification of sales and service requirements, and it says notwithstanding any term in the contract. That very last clause might modify only that third. And I've read it many, many times. It's hard to harmonize. That's the only way I can possibly harmonize it is at the legislature, and adding that final clause that says notwithstanding any term or provision of the contract to the contrary only modifies that third clause. Then you can read it in harmony and say you can't do, you can't cancel, you can't non-renew, or you can't modify even though your contract says that you can in these particular regards. But our concern is if you look at clause 3 of 46 and say that you can offer renewal as long as you don't do these very narrow things, that really throws out any effectiveness of the first two clauses because, and I think you can't do indirectly what is absolutely prohibited from doing directly. You could offer a renewal clause, for instance, say you're a Ford dealership. The Ford franchisor can say, okay, here's your renewal, but you can't sell Tauruses and Ford trucks anymore. Your only product line is Focuses. Well, under Airstream's interpretation of that clause C, that'd be fine because it didn't increase your sales obligations or your capital requirements. Here, quite frankly, our sales requirements and obligations were changed. They were eliminated entirely. So if you want to just have a hyper-technical reading of the third clause, then they violated even under those circumstances because they've eliminated our sales obligations entirely. But they come back and say, no, that's not what it means. We just can't increase your obligations. When you say sales obligations, you're reading that narrowly as to what aspect of the business. The exact language, and I'm struggling to find it here. The exact language says, terms and provisions of the effector, which is to substantially change or modify the sales and service obligations or capital requirements. I know that, but I'm talking about in terms of being a dealer. What do you construe to be a sales obligation? In the original contract, there was a sales obligation that you had to sell a certain number of vehicles. And what's the service obligation? I don't think there was any particular service obligation in that first contract. Is it not possible to say, if I have a territory that I'm granted exclusivity over, don't I have a sales obligation and a service obligation within that territory? I don't know. Well, it seems to me that common sense would tell you that would, wouldn't it? None of you argue it. I can't understand why not. I think we'd be happy with that. Well, I know, but I don't understand why I'm not arguing it. Likely I could have an entire exclusivity for service. That would be wonderful because I'd get a lot of money. Well, did they have exclusivity as to the state of Illinois? Yes. I mean, you know, I don't know. He didn't argue it, so he didn't argue it. Well, I think our, I'm not sure the narrow reading of sales and service obligation under this statute has to track a franchise agreement written by and between two parties. That's what I think you, I see that's what's been done there. I mean, or it's not been addressed. But arguably under the statute they do talk about that. Well, sales and service. They don't talk about territory, so is territory really subsumed under a sales obligation? Well, in the sales obligations, it seems to me that the parties agreed at the trial level that it really wasn't an obligation. It was a goal or something like that. There was no, like, if you don't sell X units, you're out the door. It was like. That's the way the contract was written, and I think people can construe that. But I'm saying it could be argued more expansively. That's all I'm asking that question. But again, it wasn't argued, but go ahead. The point we make in our brief is that really if the third clause of 46 is construed as Airstream construes it, then if a franchisor wants to get out from under its obligations under a franchise agreement, he can simply do it. It can reduce the allocation of vehicles. It can reduce the kind of vehicles you can sell. It can reduce the territory. If you think about a 15-mile restricted area of Yelman, Illinois, you're encompassing probably much less than 1% of the population of Illinois. The client previously enjoyed statewide protection, and they bargained for that protection. They spent money going to trade shows and bringing up the Airstream brand, and then at the end of the day it wasn't allowed to continue that. The legislative intent was to protect franchisees. If there's a backdoor or loophole in that third clause where the franchisor can always eviscerate the fundamental business terms by eliminating territory, eliminating the right to sell certain vehicles, they can take away 99.9% of the economic value of the contract and get away with it as long as they don't increase the obligations. Well, our problem here is that they tried to increase them, and they took everything away. Well, let me add, they certainly could have put a franchise right across the Indiana border with no problem. Certainly, yes. Which might even have been closer than somewhere else in Illinois or Heron, for that matter. Right. The original contract, what could your client sell of Airstream? The original contract was only for the motorized vehicles, but the negotiation was that there was an existing Airstream trailer dealer who was winding down selling out his inventory, and as soon as that was done, because they had the exclusivity, as soon as that was done, my client would step in and have that as well. So the expectation on renewal was it would be renewed, we would still have the motorized vehicles, and then we would also get the trailers. But you claim or are arguing there was no notice yet. Correct. I think they clearly did not satisfy any of the notice or cost. In other words, when you have a franchise right and it has exclusivity the way we read the statute, you have a real right there. And you're justified in going out and expending resources to build up that brand, build up your goodwill, build up your business, and the only way that can be taken away from you is with cause and with notice. It's not just that they can give you notice and arbitrarily do it. They have to have a reason for doing that. Well, and everything you say makes sense from a franchisee's point of view, but the only problem that I see here is that isn't what the legislature said. They limited those things that couldn't be substantially changed to those items in that third clause, and that's where I'm having trouble. I understand. And I think that statute is problematic in that regard because it is hard to grapple with what the legislature really intended. They came out and said there are three things you can't do, cancel, non-renew, and then the third is really something you can't do, but Airstream is turning around and saying, aha, that's an affirmative statement that we can do things that aren't proscribed in the third clause. It's by inference, not by affirmative statement. Well, statutory construction is expressionis, exclusio, right? In other words, by saying you can't do this means you can't do anything else. But respectfully, Clause 2 of 4D6 says you can't non-renew. Standing alone, those are three separate prohibitions, and the second prohibition is you can't non-renew. See, that's where I guess I go back to. You were saying I lost this exclusivity of this territory, and that's the real rub here. Yes. And now I'm into a statutorily under this renewal agreement because it's not mentioned, right? The statute is a fallback provision of 15 miles. Correct. Unless stated otherwise in the agreement. That's correct. The sales and service obligations, if you have an exclusive territory, don't you have an obligation to sell within that territory and service within that territory? Well, I would agree. I would adopt that. I mean, you can't, because otherwise you will have good cause for termination, either during dependency of this franchise agreement or certainly at the expiration of it. You can't say headquarters Airstream calls and says there's somebody up in Joe Davies County that wants service on a hub, on a trailer, or some other system. And you say, well, I'm way down here in Gilman. Send somebody over from Wisconsin. Well, I would agree with that and essentially ask to adopt that argument. And I would say that in terms of the context of that, my client did go to the annual trade shows throughout the state of Illinois, up to Chicago all the time. They didn't just market in Gilman, Illinois. They viewed themselves as having these exclusive territorial rights. So you keep talking about rights again. Well, and certainly obligations. I mean, if you're a corporate and you say, I think you're in exclusive territory, part of that is you've got to go to trade shows. You say, I'm too busy. I like being here in Gilman. I don't like to go up to the big city. What's a trade show for? To fulfill the sales obligations. I don't know. Then that second clause has meaning if you define that. But I want to hear opposing counsel on that. Counselor, you have two minutes. We can't fill in the blanks that you're suggesting that the legislature doesn't fill in. We can't say, well, they really meant this, that, or the other, can we, as a court? I would agree with that. And, again, courts can't. Which of the statutes is in the statute? Right. And I think that is exactly right. Somehow the court needs to determine what was the legislative intent here. That's the bottom line with all the rules of construction. And our bottom line point is the legislature, in adopting this scheme of things that you can't do, certainly could not have intended to say you can't do A and B, but if you're real crafty, you can send out a renewal that doesn't look anything. You know, you could send out a blank piece of paper that had no rights in it at all. You could totally eviscerate the underlying contract here. Well, let me ask you this, if I may, because, you know, the statute of construction, I certainly understand the argument, but I'm guessing that counsel, your opposing counsel is fixing to jump up here in a few minutes and say, look, Mr. Riffle's telling you they got all their rights eviscerated, and yet the facts are they made a lot more money under this new contract than they did under the old contract. So where's the harm, you would say? The harm is that we don't have the right and obligation, I guess, to continue to sell these indefinitely into the future, absent for cause termination of those rights. We thought we had bargained for these protected rights under the Franchise Act that would exist indefinitely so long as we did not, so long as Erskine didn't have cause to terminate us. That's a real valuable thing that a business person would invest time and effort and money into, and when that is taken away, there's really no longer any incentive to go out and try to use Gilman, Illinois, as a springboard to go out there and make money. The result, I don't think, and I'll grant you, my client did make more money in certain years after that, but that doesn't mean that there's not a violation as of the time that they failed to offer us a renewal on essentially those same terms because, again, we come back and say that the legislature could have intended to allow a franchisor to utilize that third clause to essentially undermine the business terms. Again, the examples I've come to are Ford dealerships saying you can only have one of our many product lines or saying, you know, there are a lot of things that could be taken away. You know, take an extreme example where a dealership says, okay, we're only going to allocate one car this year. Could you do that under Clause C? Under Erskine's interpretation, you could. You could say, okay, before we were going to give you as many cars as you wanted, but this year you only get one car. Well, it didn't increase your capital requirements, it didn't increase your sales and service obligations, and therefore we're okay under Clause C, but that doesn't seem in harmony with the legislative intent to protect the franchisees from hardball tactics to franchisors, and that's what the only, the very scant case law in Illinois is to the effect that that's the legislative intent, is to protect the franchisees that have these rights in their franchise agreements. Can it be argued anyway that this is more, this statute seems to be more geared toward Fords and Buicks and Lexuses and whatever, Cadillacs, you name it, as opposed to these uber expensive, you know, and it's almost like they weren't thinking about this type of dealership when they drafted this statute. But yet it does technically apply to our circumstance, I believe, and I guess the only analogy I have to say is maybe some high-end vehicles or something like that where somebody would have a larger protection, I would grant you most of the car franchisees probably wouldn't have the need for these more extensive protections. Thank you very much. Thank you, Mr. Riffle. Mr. Perdue, you may respond. A few questions to answer. Good afternoon, Your Honor. Good afternoon, Mr. Riffle. May it please the Court, my name is Russell Perdue. I represent the appellees and the defendant below Airstream, and I want to address some of the questions that the panel just presented to Mr. Riffle. But kind of an overview here, I think a couple of things, or at least one thing that Mr. Riffle and I agree upon is that this is a pure case of statutory interpretation. It was appropriate for the trial court to address on summary judgment. Mr. Riffle seems to agree that it's appropriate. It's a legal issue appropriate for resolution by a court. So I think we're in agreement on that. Kind of an overview statement is that here, Mr. Riffle, it occurs to me that R&R is asking the court to grant it something more than it had ever gotten itself. R&R was given under the first agreement statewide exclusivity to sell motorhomes. And what it is asking this court for, and what it asked the trial court for, is statewide exclusivity as to additional vehicles, trailers and vans. Because that is what Airstream of Chicago sells, is trailers and vans. And R&R never had that, not at any point in time. That was never given to it, and that was never taken away by anyone. So I think that that's... Did they have a history of selling those, some trailers? Did they have, later on, international and a couple... Did R&R have a history of Airstream? R&R. R&R, no, they did not. Not for Airstream, anyhow. I can't speak to whether or not they sold those products. Yeah, but we're just dealing with the Airstream product line. No. Their first agreement with Airstream was in 2000. And at that time, the only thing that they were authorized to sell, and the only thing they sold up until 2002 for Airstream was the motorhomes. It wasn't until that second agreement was signed that they were given the right to, and that they, in fact, did begin selling the trailers. Okay. It was on the second, the renewal agreement. Correct. That's right. I want to pick up on a point that was made that I think is correct, which is that the legislature here set forth three things. I agree with Mr. Ripple on this basic structure. But I think that, unlike him, I think it's very easy to harmonize and to figure out how those three things play together. There's three things that a manufacturer cannot do without going through the notice and the good cause requirements. Number one, they can't simply out-and-out cancel an agreement. Even if the contract gives them that right to cancel on 10 days notice or whatever it might be, they cannot simply say, you know what, we're done with you, you can't sell our products anymore. That's clear. If you ever want to do that, you have to give notice and good cause. Number two, you can't fail to renew. This first agreement that they had was one that had an expiration date built into it, July 31st of 2002. Airstream could not have simply allowed that to pass and say, you know what, we're done doing business with you, thank you very much, but we're not going to let you sell our products anymore. So that's the second thing. That's distinct from canceling during the pendency of the agreement. No, they use the term extend. Is it extend and renew? Renew or extend. But when an agreement comes, they just say extend. Well, I'm going to take that thing. Let's read it. To fail or refuse to extend is what the statute says. That's right. So extend. Right. But in any event, the point being that they can't kill the agreement in the middle of it, and if the agreement has its own internal expiration date, they can't simply allow the agreement to die without negotiating an extension of that agreement. To do that, they've got to give notice and they have to have good cause. Then the third thing is a distinct scenario that the statute addresses. What the third thing addresses is if you're going to offer an extension or it says a renewal, replacement, or succeeding agreement. These words are chosen by legislature for a purpose here. We have extension in the second provision, second step, stage. Now we have renewal. I'm just asking my question when I see that. Is there a distinction? That's correct. I don't think that there is because I think that while I agree that we should look at these words, the words are important, that's what our trade is, I think that if you look at how these scenarios flow together, you see a very natural interaction among the three provisions where you have terminating an agreement, letting the agreement die, and then offering a new agreement upon the expiration of that one that makes some changes. So it encompasses all of these different ways in which the manufacturer and the dealer's relationship could either be ended or changed. And what it says is, just as Schmidt, I think, rightly pointed out, is if you're going to make some changes, if you're going to allow this relationship to continue, but you want to change it, there are some changes that you can't make without the notice and the good cause. You can't substantially change sales obligations, service obligations, or capital requirements. These are places where the legislature drew a line in the sand and said, if you want to do those things, we're going to protect those. We're not going to allow you, the parties, to enter into your own contract. We're going to step in and alter your contract rights and say, no matter what you guys agree to, we're not going to allow you to do that. You're going to have to go through this notice and good cause requirement. So I don't think that it's a reasonable interpretation, as R&R says, to basically say you can't make any changes to an agreement whatsoever, because that is, in a sense, failing to renew. Because as I think it was pointed out and as I think it's pointed out in our brief, that does a lot of things wrong in terms of statutory construction. It renders that third provision, the renewal, replacement, or succeeding franchise provision, it renders it superfluous. If you're going to say you can't make any changes at all to the agreement with that notice or good cause, then there's no need to define three specific categories of change that require notice and good cause. You could have just stopped at the second clause, the fail or refuse to extend clause. So it renders it superfluous. It reads it essentially out of the statute. And I think that the third one that we discussed in our brief was you have to apply a specific provision over a general provision. Here, Airstream did not cancel the agreement. It didn't simply allow the first agreement to expire and try to avoid doing any further business with an R&R. It offered a renewal, replacement, or succeeding agreement. You can characterize the second agreement, I think, with any of those terms. So it did exactly what this third clause is talking about. And there is no argument that that replacement agreement substantially altered sales obligations, service obligations, or capital requirements. So I think that this third clause applies most specifically to the facts of this case, and there's really no argument that R&R or that Airstream rather violated that. Let me ask you, when the legislature brought this up with Mr. Ruckel, do you really think when the legislature would sit down there and just pretend they were in Springfield when they were doing this, and do you really think they were thinking about people selling Bentleys or Maybachs or Airstreams as opposed to people selling Fords and Chevys? Well, I think that that's right. I think that's a fair point, that this is really something that's geared towards cars, which is why you see a 10-mile protection in urban areas, a 15-mile protection in rural areas. That is deemed sufficient, and that's a common. There are other statutes in other states. Some of the cases we talk about apply similar statutes in other states. And that's generally an area that's used in a lot of other states. And it makes sense for cars because that is an area that the legislature is going to protect, that if you have another car dealership that's at least 10 or 15 miles away, then you're going to have the opportunity to make your market without undue competition. So I think it's right that this was drawn up with cars in mind. It does apply to the RVs, and we don't argue otherwise. But I think that when we're getting into legislative intent, it's important to bear that in mind, that that's what this statute was designed with the intention. That's what this 15-mile sales territory comes from. That might not be a perfect fit for an RV. If we were all going to sit down and come up with an RV franchise act, we would probably design a larger default area as a protection. But one thing that I'd like to address as well is, Justice Holbrook, your questions about, well, does sales territory, does that fall within this prohibition of a sales obligation? And I don't think it does. I mean, as you pointed out, first of all, it's a new argument. It wasn't one that was raised below. Aside from waiver issues, it makes it a little bit difficult. I was scrambling back there when I heard you raise the question to come up with an argument. But I don't think that it does. The sales territory really is not tied to, if you look at the sales agreement with R&R, the sales territory really is not tied to either their sales obligations or their service obligations. Their sales obligations are defined by a couple of things. One, there's a dealer data sheet that says sales goal. It says in the first year they have to sell 8 units, in the second year they have to sell 12 units. Now, I think it's a point Justice Carter pointed out that, or one of you pointed out, that at its deposition the owner insisted that is not an obligation, that was just a goal, that wasn't mandatory. So R&R themselves said that they didn't feel that they had any sales obligations under the first agreement. But this isn't tied to any specific territory. This is just the number of units that they needed to sell. And I don't think it's in the record because it wasn't an argument that was raised, but at its deposition R&R's owner did testify that he could sell units anywhere. He wasn't restricted to selling only in Illinois. He could sell units anywhere. The other point is about service obligations. If you look at the first sales agreement or the second one, which is in the record, the only thing it obligates the dealer to do is to provide in-house service. It says, as authorized service facility for Airstream product, dealer agrees to provide in-house service capability to fulfill dealer's commitments. This was even under the statewide territory exclusivity. Yes, that's the same under both agreements. The agreements were pretty similar. It was really that last dealer data sheet that was different about the two agreements. But, yeah, that's true in both agreements. Well, neither Airstream or any other vehicle manufacturer can tell somebody that owns one of their vehicles where they've got to get it fixed, right? Absolutely. So a service requirement doesn't make any sense because the guy can go anywhere he wants. If they order parts for that vehicle from Airstream, for example, Airstream's got to sell them to the Ford dealer if that's where the guy says he wants his Airstream fixed, correct? That's absolutely right. And I also think, though, that it's fair to say R&R could not be penalized. For example, Airstream could not say, R&R, you're being delinquent, and therefore we're going to terminate your agreement. If R&R refused to go out to Gurney or some other far-flung place in Illinois to provide service, they have no obligation under their agreement to provide it. Only because of that provision of in-house. Absolutely. That's the only reason, though. Well, I mean, that is the... That's in this agreement. I'll say it's the only reason that I came up with as I was sitting at council table, and I think it's a sufficient reason in that it does, it specifically says they're obligated to provide in-house service, and if I was here arguing we terminated them because they refused to go to Gurney, Mr. Riffle would say, hey, this says in-house service only, and he'd have a good argument there. I think what's important is, you know, Mr. Riffle came up with some doomsday scenarios about horrible things that manufacturers could do. I think it's, someone pointed out correctly, I think that those are undermined here somewhat by the fact that R&R did quite well under that second agreement. Their sales went way, way up because that second agreement, while it took away the exclusivity for motorhomes, gave them the right to sell trailers and vans, and they sold a lot of those and made a lot of money. And they admitted at their deposition, yeah, that was a big benefit to us, getting to sell those products. It did not damage us at all. We can't think of a single way that that damaged us. They also, to get back to the question about, well, does this change in territory affect sales obligations in some way? You know, I asked them this at their deposition, and this is in the record as well. Did this change in territory affect the way that you did business at all? Can you tell me any way in which it affected the way you did business? And he said no. This was the owner, Mr. Clark, of R&R. That the second agreement did not change the way that he did business at all. So I don't think that it's reasonable to say that. Even though there wasn't the manufacturer's support for attending trade shows or promoting? Correct. I mean, he talked about that, but when I asked him the question, did it change the way you did business, he said no. I think what this sales and service obligation and capital requirements is about is where we change something where they're obligated to sell 8 or 12 units or something when they first sign the agreement, and then we make it 800, something that they clearly can't meet. Or we say, you know what, you've got to have a lot more capital invested in your company. We want more security in this. Or we do something else to make it impossible for them to meet this, and then we can say, well, you're not meeting the requirements, so we're going to terminate the agreement. That's what the sales and service obligations and the capital requirements, I think, are getting at. And your argument would be because there's a separate provision for territorial protection, a default provision in the statutory scheme. That's right. If the legislature was concerned about protecting territory, they could have done that. They talked specifically about sales territory. But they didn't protect it. They didn't protect it. That's right. They did offer a protection, this 10- or 15-mile protection. That's the protection they gave. But if they wanted to offer this protection in the section that talks about what changes you can make, they could have spelled that out specifically. And the last point that I want to make that I think is important is these are statutory causes of action. These are statutes that were made in derogation of the common law. Supreme Court law, very, very clear. This is the NRA WW case we sat in our brief, is that when you have statutes like that, you have to strictly construe them. You only have a cause of action under them if the statute, quote, absolutely requires, unquote, that the cause of action exists. So when we're interpreting this, we need to resist the temptation to interpret this statute broadly or to think about, well, surely they didn't mean that. I heard Mr. Rickles say, well, surely the legislature didn't intend to do that, did not have intended that. That isn't appropriate here. I mean, I'm always suspect when someone, rather than reading the language of the statute, begins offering their opinion as to what the legislature meant by it. But here particularly, we've got to be careful about speculating about legislative intent because this is a purely statutory cause of action. It's in derogation of the common law, and those statutes have to be strictly construed. The last, I guess I'll try to make one last point, which is that even if the second agreement was void,  the Airstream of Chicago establishment of them does not violate the Franchise Act because they sold different products. Did you get that all the way? Thank you. You can finish. Oh, thank you. Airstream of Chicago sold different products than R&R sold under the first agreement. If we invalidate the second agreement and say, you know what, the first agreement should still apply, then what we have is statewide exclusivity as to motorhomes only. Airstream of Chicago only sold trailers and vans. There's no competent evidence in the record to suggest they sold anything else. That's what their agreement says. So there's no violation by setting up a competing dealer that sells different products. I don't believe there are any more questions. Thank you, Mr. Perdue. Mr. Ripple, you may reply. Thank you, Eric. I guess the first point I'd like to clarify is we agree in the record before the court, we have no right to statewide exclusivity beyond the motorized vehicles. So to the extent that we'll— Is this, under your view, is the second contract, is it void? Yes. So that means if it's void, then they can take away your trailers and your vans too? Well, the progression of this was that it was negotiated that we would get the motorized vehicles, that there was an agreement on that, and there was an oral agreement that we would eventually get the trailers. We have no written contract protection on that, and we haven't made that separate argument that we would also have those rights. But I would agree with this, that if we were to invalidate and go back to the original agreement, that agreement is just with respect to motorized vehicles. We wouldn't give up with any argument we would have as to separate entitlement that would be based on the oral understanding. You know, trying to figure out what the legislature meant, certainly it's important to protect franchisees, people who've made investments, but it's also important to protect the consumer too, right? I mean, competition isn't necessarily bad, especially if you're a consumer. So to create a monopoly, if you will, is generally considered an un-American thing to do, right? And so, I mean, should we consider that aspect of this when we're trying to figure out what the legislature meant with this? Well, the only case law I see is that the legislature enacted this act just for that sole purpose of protecting the franchisees. If we were to look just to the strict letter of this statute, I think we win, even without rules of construction. The second clause says, they cannot fail to refuse to extend the franchise or selling agreement of the motor vehicle dealer upon its expiration. That's what they did. They violated that statute, that separate prohibition. Then Airstream comes in and says, but we have a construction of Section 3 that says that we're okay. But that really doesn't say that. Council says that this is some kind of an affirmative statement of what you can change in an agreement. I don't think that's what this is at all. That's not what it's set out to be. If the legislature intended to say, here's the category of things you can change, they could have said that in an affirmative statement, as opposed to within a provision that is three separate prohibitions on what you can't do. And again, they come back to that clause at the very end. Admittedly, it's hard to really harmonize and it's hard to really understand what the legislature meant. But if you look at that notwithstanding clause as modifying only the third clause of 4D6, then what that says is, you can't cancel, you can't refuse to extend, and then when you renew, you can't offer renewal on the changes to the capital requirements, even if your agreement says you can. What's the difference between renewing and extending? I really honestly don't have an understanding of the difference there. Extend, I think you could make an argument that you have to do it on the basic terms of that agreement. That's how I've always interpreted it. But if you do that, doesn't that render the third clause superfluous? Unless you read that notwithstanding language as saying that you can't do renewal, even under the circumstances where it says you can change it, then you've got this separate statutory protection because of that notwithstanding language. But again, we still cannot come to any thought that the legislature intended to say, okay, you've got protection from cancellation, protection from non-renewal, and oh, by the way, we're going to throw in a catch-all here that says forget A and B, you can just go behind the guise of a renewal, take away territory, take away product line, take away basically every right you have. So you're, you harmonize, you think three, your argument is that clause three says that you, two agreeing parties can't contract their way around this statute. Can't contract their way around that last type of provision that involves the increase in capital requirements or the increase in sales obligations. So if you read that that way, obviously you can't cancel, you can't refuse to extend, and when you renew, even if your agreement says you can raise the capital requirements, you can't do that without notice and clause. That would be one way to interpret those in harmony. Now, certainly if that was what the legislature intended of a grant, it would be nice for them to put different punctuation there or somehow clarify it. But again, you're faced with two very different readings of this. I think both are plausible. I think the better reading of this respectfully is if the legislature intended to protect franchisees under circumstances from having their underlying franchise rights eviscerated by major drastic changes in the agreement, and that they wouldn't say you can't fail to extend, and then go on to say that you can renew on drastically different circumstances that take away the economic value. If there are no questions, I thank you very much. I don't believe there are. Thank you, counsel, for your arguments in this matter. It will be taken under